# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

FILED

2019 OCT 25  P 5: 04

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | | |
|---|---|---|
| TAMMY WEST, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | JURY TRIAL DEMANDED |
| | ) | |
| v. | ) | |
| | ) | Civil Action No. _____ |
| DePUY ORTHOPAEDICS, INC., DePUY | ) | |
| PRODUCTS, INC., DePUY INTERNATIONAL, | ) | |
| LIMITED, JOHNSON & JOHNSON, | ) | |
| JOHNSON & JOHNSON SERVICES, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT AND JURY DEMAND

Plaintiff, **Tammy West**, brings this Complaint against DePuy Orthopaedics, Inc. ("DePuy Orthopaedics"), DePuy Products, Inc. ("DePuy Products"), DePuy International, Limited ("DePuy International"), Johnson & Johnson, and Johnson & Johnson Services, Inc. (hereinafter collectively referred to as "Defendants"), and allege as follows:

## NATURE OF THE ACTION

1.      This is an action for damages suffered by Tammy West as a direct and proximate result of Defendants' defective development, design, testing, manufacturing, distribution and sale of the DePuy Pinnacle total hip replacement system.

2.      Tammy West has suffered and continues to suffer very serious bodily injuries, including pain and suffering as a direct and proximate result of the defective DePuy Pinnacle left hip replacement implanted on or about November 19, 2015.

## THE PARTIES

3.    Plaintiff Tammy West is a resident and citizen of Ardmore, Limestone County, Alabama.

4.    Defendant, DePuy Orthopaedics, Inc. is, and at all times relevant was, a corporation organized and existing under the laws of the State of Indiana, with its headquarters and principal place of business at 700 Orthopedic Drive, Warsaw, Indiana 46581.

5.    At all times relevant, DePuy Products, Inc. was engaged in the business of designing, licensing, manufacturing, distributing, selling, marketing, and/or introducing into interstate commerce, either directly or indirectly through third parties or related entities, numerous orthopedic products, including the DePuy Pinnacle system, as well as monitoring and reporting adverse events. DePuy Products, Inc. had a role in the decision process and response of the Defendants, if any, related to these adverse events.

6.    Upon information and belief, Defendant DePuy Orthopaedics, Inc. is a wholly owned subsidiary of DePuy Products, Inc. which in turn is a subsidiary of Johnson & Johnson.

7.    Defendant DePuy Products, Inc. is, and at all times relevant was, a corporation organized and existing under the laws of the State of Delaware, with its headquarters and principal place of business at 700 Orthopedic Drive, Warsaw, Indiana 46581.

8.    DePuy International, Limited, is a corporation organized and existing pursuant to the laws of the United Kingdom, with its principal place of business located at St. Anthonys Road, Leeds, West Yorkshire, LS11 8DT.

2

9.      Defendant Johnson & Johnson Services, Inc., is a New Jersey corporation with its principal place of business located at One Johnson & Johnson Plaza, New Brunswick, New Jersey 08933.

10.     Defendant Johnson & Johnson is a publicly traded corporation organized and existing under the laws of the State of New Jersey with its principal place of business at One Johnson & Johnson Plaza, New Brunswick, New Jersey 08933.

11.     As DePuy's most senior parent company, Johnson & Johnson was involved in the business of designing, licensing, manufacturing, distributing, selling, marketing, and introducing into interstate commerce, either directly or indirectly through third parties or related entities, numerous orthopedic products, including the DePuy Pinnacle system, as well as monitoring and reporting adverse events. Johnson & Johnson had a role in the decision process and response of the Defendants, if any, related to these adverse events.

12.     At all times relevant, each of the Defendants were the representatives, agents, employees, co-conspirators, servants, employees, partners, joint-venturers, franchisees, or alter egos of the other Defendants and was acting within the scope of such authority in such conspiracy, service, agency, employment, partnership, joint venture and/or franchise.

## JURISDICTION AND VENUE

13.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332.  The amount in controversy exceeds $75,000 exclusive of interest and costs, and this is an action by an individual Plaintiff against Defendants who are citizens of different states.

14.     Venue in this judicial district is proper pursuant to Case Management Order 1 issued June 29, 2011 permitting direct filing of DePuy Pinnacle cases.  At the proper time Plaintiff

3

requests this action be transferred to the United States District Court for the District of South Carolina.

## FACTUAL BACKGROUND

15.    A natural hip joint is created by the femoral head, the bone at the top of the thigh bone, or femur, which rotates within the hip socket or acetabulum.

16.    To place a Pinnacle system, the surgeon replaces a patient's natural femoral head and acetabulum with a metal or ceramic femoral head and metal acetabulum cup with a metal or polyethylene (plastic) liner.

17.    DePuy aggressively marketed the Pinnacle systems as producing better, longer lasting results than other devices on the market at the time.

18.    DePuy gained market approval of the Pinnacle hip implant system through the FDA 510(k) process.

19.    The 510(k) approval process by the FDA is regarded as a simplified application process, which does not require extensive review and approval by the FDA. A 510(k) is a pre-market submission made to the FDA by the manufacturer to demonstrate that the device to be marketed is "substantially equivalent" to a previously marketed device (known as the "predicate device") and is at least as safe and effective as the predicate device.

20.    During this process the manufacturer states that the device to be marketed does not raise any new significant safety concerns.

21.    This 510(k) pre-market approval process is reliant on the testing and integrity of the manufacturer of the device.

22.     In 2005 Defendant DePuy submitted a § 510(k) pre-market notification and obtained marketing approval for its ASR XL hips from the FDA under Section 510(k) of the Food, Drug and Cosmetic ("the Act"). *See* 21 U.S.C. § 360 *et seq.* The predicate device relied on by Defendant DePuy in its § 510(k) submission was the DePuy Pinnacle Metal-on-Polyethylene Acetabular Cup.

23.     Defendants recalled the DePuy ASR System in August 2010 and are fully aware that the DePuy ASR XL Acetabular System is defective and that hundreds of patients have been injured by a known defect. Based on the substantially equivalent design of the DePuy Pinnacle hip implant system, knowledge of the DePuy ASR defect is imputed to the DePuy Pinnacle hip implant system.

24.     Despite knowledge that the DePuy Pinnacle systems have a defect and are prone to failure, Defendants continue manufacturing, promoting, marketing, selling and distributing these defective products. In so doing, Defendants actively concealed this known defect from the doctors and patients, including Plaintiff and his doctor.

25.     At the same time, there were and are safer alternative artificial hip products readily available in the marketplace from other manufacturers which do not have elevated failure rates.

26.     Based on information and belief, the true failure rates of these devices is substantially higher than what has been reported to date by the Defendants and/or the FDA.

27.     The Defendants' claim that the ASR and Pinnacle systems are substantially equivalent is unfortunately correct as it relates to the injuries suffered by plaintiff.  Any knowledge Defendants had regarding injuries related to the Metal-on-Polyethylene property of the DePuy ASR is directly relevant to the Pinnacle Metal-on-Polyethylene device implanted in Plaintiff.

28.     Defendants have known for years that implantation of Metal-on-Polyethylene devices result in metallosis, necrosis of tissue, elevated metal ion levels in the blood and numerous other potential problems.

## FEDERAL REQUIREMENTS

29.     Pursuant to federal law, a medical device is deemed to be adulterated if, among other things, it fails to meet established performance standards, or if the methods, facilities or controls used for its manufacture, packing, storage or installation are not in conformity with federal requirements. *See* 21 U.S.C. § 351.

30.     Pursuant to federal law, a device is deemed misbranded if, among other things, its labeling is false or misleading in any particular way, or if it is dangerous to health if used in the manner prescribed, recommended or suggested in the labeling thereof. *See* 21 U.S.C. § 352.

31.     Pursuant to federal law, manufacturers are required to comply with FDA regulation of medical devices, including FDA requirements for records and reports, in order to prohibit introduction of medical devices that are adulterated or misbranded, and to assure the safety and effectiveness of medical devices. In particular, manufacturers must keep records and make reports if any medical device may have caused or contributed to a death or serious injury, or if the device has malfunctioned in a manner likely to cause or contribute to a death or serious injury. Federal law also requires the FDA to establish regulations requiring a manufacturer of a medical device to promptly report to the FDA any correction or removal of a device undertaken to reduce a risk to health posed by the device, or to remedy a violation federal law which may present a risk to health. *See* 21 U.S.C. § 360i.

32.     Pursuant to federal law, the Secretary of Health and Human Services may prescribe regulations requiring that the methods used in, and the facilities and controls used for, the manufacture, pre-production design validation, packaging, storage, and installation of a device conform to current good manufacturing practice, as prescribed in such regulations, to assure that the device will be safe, effective and otherwise in compliance with federal law. *See* 21 U.S.C. §360j(f).

33.     The regulations requiring conformance to good manufacturing practices are set forth in 21 CFR § 820 *et seq*. The Federal Register explains that the Current Good Manufacturing Practice (CGMP) regulations do not prescribe the details of how a manufacturer must produce a device because the regulations must apply to a variety of medical devices.  Rather, the quality system regulations provide a framework of basic requirements for each manufacturer to use in establishing a quality system appropriate to the devices designed and manufactured, and the manufacturing process employed. Manufacturers must adopt current and effective methods and procedures for each device they design and manufacture to comply with and implement the basic requirements set forth in the quality system regulations.

34.     Pursuant to 21 CFR § 820.1(c), the failure to comply with any applicable provisions in section 820 renders a device adulterated under section 501(h) of the Act. *See* 21 U.S.C. § 351.

35.     Pursuant to 21 CFR § 820.5, each manufacturer shall establish and maintain a quality system that is appropriate for the specific medical device designed or manufactured. "Quality system" means the organizational structure, responsibilities, procedures, processes, and resources for implementing quality management. *See* 21 CFR § 820.3(v).

36.    Pursuant to 21 CFR § 820.22, each manufacturer shall establish procedures for quality audits and conduct such audits to assure that the quality system is in compliance with the established quality system requirements and to determine the effectiveness of the quality system.

37.    Pursuant to 21 CFR § 820.30(a), each manufacturer shall establish and maintain procedures for defining and documenting design output in terms that allow an adequate evaluation of conformance to design input requirements.

38.    Pursuant to 21 CFR § 820.30(e), each manufacturer shall establish and maintain procedures to ensure that formal documented reviews of the design results are planned and conducted at appropriate stages of the device's design development.

39.    Pursuant to 21 CFR § 820.30(f), each manufacturer shall establish and maintain procedures for verifying the device design to confirm that the device design output meets the design input requirements.

40.    Pursuant to 21 CFR § 820.30(g), each manufacturer shall establish and maintain procedures for validating the device design.  Design validation shall be performed under defined operating conditions on initial production units, lots, batches, or their equivalents.  Design validations shall ensure that the devices conform to defined user needs and intended uses and shall include testing of production units under actual or simulated use conditions.

41.    Pursuant to 21 CFR § 820.30(h), each manufacturer shall establish and maintain procedures to ensure that the device design is correctly translated into production specifications.

42.    Pursuant to 21 CFR § 820.30(i), each manufacturer shall establish and maintain procedures for the identification, documentation, validation or, where appropriate, verification, review, and approval of design changes before their implementation.

8

43.     Pursuant to 21 CFR § 820.70(a), each manufacturer shall develop, conduct, control, and monitor production processes to ensure that a device conforms to its specifications. Where deviations from device specifications could occur as a result of the manufacturing process, the manufacturer shall establish and maintain process control procedures that describe any process controls necessary to ensure conformance to specifications.

44.     Pursuant to 21 CFR § 820.70(b), each manufacturer shall establish and maintain procedures for changes to a specification method, process, or procedure.

45.     Pursuant to 21 CFR § 820.70(c), each manufacturer shall establish and maintain procedures to adequately control environmental conditions that could reasonably be expected to have an adverse effect on product quality, including periodic inspection of environmental control systems to verify that the system, including necessary equipment, is adequate and functioning properly.

46.     Pursuant to 21 CFR § 820.70(e), each manufacturer shall establish and maintain procedures to prevent contamination of equipment or products by substances that could reasonably be expected to have an adverse impact on quality.

47.     Pursuant to 21 CFR § 820.70(g), each manufacturer shall ensure that all equipment used in the manufacturing process meets specified requirements and is appropriately designed, constructed, placed, and installed to facilitate maintenance, adjustment, cleaning and use.

48.     Pursuant to 21 CFR § 820.70(h), each manufacturer shall establish and maintain procedures for the use and removal of manufacturing material which could reasonably be expected to have an adverse effect on product quality in order to ensure that it is removed or limited to an amount that does not adversely effect the device's quality.

49.     Pursuant to 21 CFR § 820.70(i), when computers or automated data processing systems are used as part of production or the quality system, the manufacturer is required to validate computer software for its intended use according to an established protocol.

50.     Pursuant to 21 CFR § 820.72, each manufacturer shall ensure that all inspection, measuring, and test equipment, including mechanical, automated, or electronic inspection and test equipment, is suitable for its intended purposes and is capable of producing valid results. Each manufacturer must establish and maintain procedures to ensure that equipment is calibrated, inspected, checked, and maintained.

51.     Pursuant to 21 CFR § 820.75(a), where the results of a process cannot be fully verified by subsequent inspections and testing, the process shall be validated with a high degree of assurance and approved according to established procedures.   "Process validation" means establishing, by objective evidence, that a process consistently produces a result or product meeting its predetermined specifications. 21 CFR § 820.3(z)(1).

52.     Pursuant to 21 CFR § 820.75(b), each manufacturer shall establish and maintain procedures for monitoring internal processes and establish control of process parameters for validated processes to ensure that the specified requirements continue to be met. Each manufacturer shall ensure that validated processes are performed by qualifies persons.

53.     Pursuant to 21 CFR § 820.90, each manufacturer also must establish and maintain procedures to control products that do not conform to specified requirements.

54.     Pursuant to 21 CFR § 820.100, each manufacturer shall establish and maintain procedures for implementing corrective and preventative actions.

55.     Based on information and belief, Defendants' Depuy Pinnacle Metal-on-Polyethylene devices are adulterated pursuant to 21 U.S.C. § 351 because, among other things, they failed to meet established performance standards, and/or methods, facilities, or controls used for their manufacture, packaging, storage or installation and are not in conformity with federal requirements. *See* 21 U.S.C. § 351.

56.     Based on information and belief, Defendants' Pinnacle Metal-on-Polyethylene devices are misbranded because, among other things, they are dangerous to health when used in the manner prescribed, recommended or suggested in the labeling thereof. *See* 21 U.S.C. § 352.

57.     Based on information and belief, Defendants' Pinnacle Metal-on-Polyethylene devices are adulterated pursuant to 21 U.S.C. § 351 because Defendants failed to establish and maintain CGMP for its Pinnacle Metal-on-Polyethylene devices in accordance with 21 CFR § 820 *et seq.*, as set forth above.

58.     Based on information and belief, Defendants failed to establish and maintain CGMP with respect to quality audits, quality testing and process validation for its Pinnacle Metal-on-Polyethylene devices.

59.     As a result of Defendants' failure to establish and maintain CGMP as set forth above, Defendants' Pinnacle devices were defective and failed, resulting in injuries to Plaintiffs.

60.     If Defendants had complied with the federal requirements regarding CGMP, Defendants' Pinnacle devices would have been manufactured properly and would not have resulted in injuries to Plaintiffs.

## CASE SPECIFIC FACTUAL ALLEGATIONS

61.    Plaintiff, Tammy West, underwent a left side total hip replacement surgery at Crestwood Medical Center, Huntsville, Alabama on or about November 19, 2015, by Dr. Cobb Alexander, M.D. employing a DePuy Pinnacle Acetabular Cup and a Pinnacle polyethylene liner, which was manufactured and distributed throughout the United States by the Defendants.

62.    Plaintiff, Tammy West, underwent a left side total hip revision surgery to remove the defective DePuy Pinnacle Metal on Polyethylene hip implant on or about October 26, 2017 at Crestwood Medical Center, Huntsville Alabama, by Dr. Cobb Alexander, M.D.

63.    During the October 26, 2017, hip revision surgery, Plaintiff's doctor noted that the locking mechanism had been compromised, the acetabular liner and fractured and 20 cc of dark fluid was removed.

## COUNT I
## STRICT LIABILITY

64.    Plaintiff adopts and incorporates by reference all the foregoing language of this Complaint as if fully set forth herein and further states as follows.

65.    At all times material hereto, the DePuy Pinnacle Metal-on-Polyethylene hip implant device was defective as to design, testing, manufacture, and warnings, causing the DePuy Pinnacle Metal on-Metal hip implant device to be in a dangerous and defective condition that made it unsafe for its intended use. This condition existed at the time the DePuy Pinnacle Metal-on-Polyethylene hip implant device was placed into the stream of commerce by Defendants.

66.     Defendants knew or reasonably should have known that the DePuy Pinnacle Metal-on-Polyethylene hip implant device, as designed, tested, assembled, fabricated, produced, constructed, marketed, or otherwise prepared, distributed and sold, was defective and posed an unreasonable risk of harm to individuals, including Plaintiff, who used the DePuy Pinnacle Metal-on-Polyethylene hip implant device as intended by Defendants.

67.     Defendants failed to design, test, assemble, fabricate, produce, construct or otherwise prepare, distribute and sell a safe product, and failed to warn of the potential risks or hazards associated with the DePuy Pinnacle Metal-on-Polyethylene hip implant device.

68.     As a direct and proximate result of the defective condition and the Defendants' failure to warn of the potential risks and hazards, Plaintiffs suffered serious physical injury, harm, damages and economic loss and will continue to suffer such harm, damages and economic loss in the future.

## COUNT II
## NEGLIGENCE/WANTONNESS

69.     Plaintiff adopts and incorporates by reference all the foregoing language of this Complaint as if fully set forth herein and further states as follows.

70.     Defendants had a duty to exercise reasonable care in the design, manufacture, sale and/or distribution of the DePuy Pinnacle Metal-on-Polyethylene devices into the stream of commerce, including a duty to assure that their products did not pose a significantly increased risk of bodily harm and adverse events as well as a duty to comply with federal requirements.

13

71.    Defendants had an obligation to follow the law in the manufacture, design, testing, assembly, inspection, labeling, packaging, supplying, marketing, selling, advertising, preparing for use, warning of the risks and dangers of the DePuy Pinnacle Metal-on-Polyethylene devices, and otherwise distributing the DePuy Pinnacle Metal-on-Polyethylene devices.

72.    Defendants' acts and omissions constitute an adulteration, misbranding, or both, as defined by the Federal Food, Drug and Cosmetic Act, 21 U.S.C §§ 331(a) and 333(a)(2), and constitute a breach of duty, subjecting Defendants to civil liability for all damages arising therefrom.

73.    Plaintiff, as a purchaser of DePuy Pinnacle Metal-on-Polyethylene devices, is within the class of persons that the statutes and regulations previously described herein are designed to protect, and Plaintiff's injuries are the type of harm these statutes and regulations are designed to prevent.

74.    Defendants failed to exercise ordinary care and/or were negligent and/or wanton in the design, formulation, manufacture, sale, testing, quality assurance, quality control, labeling, marketing, promotion and distribution of the DePuy Pinnacle Metal-on-Polyethylene devices into interstate commerce because Defendants knew or should have known that these products caused significant bodily harm and were not safe for use by consumers.

75.    Despite the fact that Defendants knew or should have known that the DePuy Pinnacle Metal-on-Polyethylene devices posed a serious risk of bodily harm to consumers, Defendants continued to manufacture and market the DePuy Pinnacle Metal-on-Polyethylene devices for use by consumers and/or continued to fail to comply with federal requirements.

14

76.     Defendants knew or should have known that consumers, such as Plaintiffs, would foreseeably suffer injury as a result of Defendants' failure to exercise ordinary care as described above, including the failure to comply with federal requirements.

77.     As a direct and proximate result of Defendants' negligence and/or wantonness, Plaintiffs suffered serious physical injury, harm, damages and economic loss and will continue to suffer such harm, damages and economic loss in the future.

78.     Plaintiff contends that the conduct of the Defendants as described above, including, but not limited to, their failure to adequately design and manufacture, as well as their continued marketing and distribution of the DePuy Pinnacle Metal-on-Polyethylene devices when they knew or should have known of the serious health risks these devices created and/or the failure to comply with federal requirements, is attended by circumstances of oppression, fraud, malice, willfulness, wantonness, and constitutes a conscious, reckless and flagrant disregard for human life, which warrants the imposition of exemplary damages.

## COUNT III
## BREACH OF EXPRESS WARRANTY

79.     Plaintiff adopts and incorporates by reference all the foregoing language of this Complaint as if fully set forth herein and further states as follows.

80.     Defendants expressly warranted that the DePuy Pinnacle Metal-on-Polyethylene devices were safe and effective orthopedic devices for those patients requiring a hip replacement.

81.     The DePuy Pinnacle Metal-on-Polyethylene devices manufactured and sold by Defendants did not conform to these express representations because they caused serious injury to Plaintiff when used as recommended and directed.

82.    As a direct and proximate result of Defendants' breach of warranty, Plaintiffs have suffered serious physical injury, harm, damages and economic loss and will continue to suffer such harm, damages and economic loss in the future.

## COUNT IV
## BREACH OF IMPLIED WARRANTIES OF
## MERCHANTABILITY AND FITNESS
## FOR A SPECIFIC PURPOSE

83.    Plaintiff adopts and incorporates by reference all the foregoing language of this Complaint as if fully set forth herein and further states as follows.

84.    At the time the Defendants designed, manufactured, marketed, sold, and distributed the DePuy Pinnacle Metal-on-Polyethylene devices for use by Plaintiff, Defendants knew of the use for which the DePuy Pinnacle Metal-on-Polyethylene devices were intended and impliedly warranted these products to be of merchantable quality and safe for their particular use in that their design, manufacture, labeling, and marketing complied with all applicable federal requirements.

85.    Plaintiff and/or his physician reasonably relied upon the skill and judgment of Defendants as to whether the DePuy Pinnacle Metal-on-Polyethylene devices were of merchantable quality and safe for their intended particular use and on Defendants' implied warranty as to such matters, including that they were in compliance with all federal requirements.

86.    Contrary to such implied warranties, DePuy's Pinnacle Metal-on-Polyethylene devices were not of merchantable quality or safe for their particular intended use because the products were defective as described above, and/or failed to comply with federal requirements.

87.     As a direct and proximate result of Defendants' breach of warranties, Plaintiff have suffered serious physical injury, harm, damages and economic loss and will continue to suffer such harm, damages and economic loss in the future.

## COUNT V
## FAILURE TO WARN

88.     Plaintiff adopts and incorporates by reference all the foregoing language of this Complaint as if fully set forth herein and further states as follows.

89.     In their regular course of business, Defendants designed, manufactured and sold the DePuy Pinnacle Metal-on-Polyethylene for hip repair surgeries.

90.     At the time of the design, manufacture and sale of the DePuy Pinnacle Metal-on-Polyethylene device, and specifically at the time Plaintiff received the DePuy Pinnacle Metal-on-Polyethylene device, it was defective and unreasonably dangerous when put to its intended and reasonably anticipated use. Furthermore, the DePuy Pinnacle Metal-on-Polyethylene device was not accompanied by proper warnings regarding significant adverse consequences associated with the device.

91.     Defendants failed to provide any warnings, labels or instructions of its dangerous propensities that were known or reasonably scientifically knowable at the time of distribution. The reasonably foreseeable use of these products involved significant dangers not readily obvious to the ordinary and intended user. Defendants failed to warn of the known or reasonably knowable injuries associated with malfunction of the DePuy Pinnacle Metal-on-Polyethylene device.

17

92.    The dangerous and defective conditions of the DePuy Pinnacle Metal-on-Polyethylene device existed at the time it was delivered by the manufacturer to the distributor. At the time Plaintiff had his surgery, the DePuy Pinnacle Metal-on-Polyethylene device was in the same condition as when it was manufactured, distributed and sold.

93.    Plaintiff did not know any defects existed in the DePuy Pinnacle Metal-on-Polyethylene device at the time of use or at any time prior thereto.

94.    Plaintiff suffered the aforementioned injuries and damages as a direct and proximate result of Defendants' failure to warn.

95.    The conduct of Defendants in continuing to market, promote, sell and distribute the DePuy Pinnacle Metal-on-Polyethylene device after obtaining knowledge that the products were failing and not performing as represented and intended, showed a complete indifference to and/or conscious disregard for the safety of others, which justifies an award in such sum that will serve to deter Defendants and others from similar conduct in the future.


## COUNT VI
## UNJUST ENRICHMENT

96.    Plaintiff adopts and incorporates by reference all the foregoing language of this Complaint as if fully set forth herein and further states as follows.

97.    As the intended and expected result of their conscious wrongdoing, Defendants have profited and benefited from the purchase of the DePuy Pinnacle Metal-on-Polyethylene device by Plaintiff.

98.     Defendants have voluntarily accepted and retained these profits and benefits, derived from Plaintiff, with full knowledge and awareness that, as a result of Defendants' fraud and other conscious and intentional wrongdoing, Plaintiff was not receiving a product of quality, nature or fitness that had been represented by Defendants or that Plaintiff, as a reasonable consumer, expected.

99.     By virtue of the conscious wrongdoing alleged above, Defendants have been unjustly enriched at the expense of Plaintiff, who in equity is entitled to, and hereby seeks, the disgorgement and restitution of Defendants' wrongful profits, revenues and benefits, to the extent and in the amount deemed appropriate by the Court, and such other relief as the Court deems just and proper in order to remedy the Defendants' unjust enrichment.

## COUNT VII
## PUNITIVE DAMAGES: WILLFUL AND WANTON CONDUCT

100.     Plaintiff adopts and incorporates by reference all the foregoing language of this Complaint as if fully set forth herein and further states as follows.

101.     Plaintiff is entitled to punitive damages because Defendants' wrongful acts and/or omissions were willful and wanton conduct and in conscious and intentional disregard of, and indifference to, the rights and safety of others. Defendants misled both the medical community and the public at large, including Plaintiff, by making false representations about the safety and effectiveness of the Pinnacle Metal-on-Polyethylene device and by failing to provide adequate instructions and training concerning its use.

19

102.    Defendants downplayed, understated, and/or disregarded their knowledge of the serious and permanent side effects and risks associated with the use if the Pinnacle Metal-on-Polyethylene device despite available information demonstrating that the Pinnacle Metal-on-Polyethylene device could cause particles of cobalt and chromium to be deposited into Plaintiff's body and cause the device to loosen and become displaced or separate, causing serious harm to patients. Such risks and adverse effects could easily have been avoided had Defendants not concealed knowledge of the serious risks associated with the Pinnacle Metal-on-Polyethylene device or provided proper training and instruction to physicians regarding use of the Pinnacle Metal-on-Polyethylene device.

103.    Defendants' misrepresentations include knowingly withholding material information from the medical community and the public including Plaintiff, concerning the safety of the Pinnacle Metal-on-Polyethylene device.

104.    Defendants were or should have been in possession of evidence demonstrating that the Pinnacle Metal-on-Polyethylene device caused serious side effects. Nevertheless, Defendants continue to market the Pinnacle Metal-on-Polyethylene device by providing false and misleading information with regard to its safety and effectiveness.

105.    Defendants failed to provide warnings that would have dissuaded health care professionals from using the Pinnacle Metal-on-Polyethylene device, thus preventing health care professionals, including Plaintiff's surgeon, and consumers, including Plaintiff, from weighing the true risks against the benefits of using the Pinnacle Metal-on-Polyethylene device.

106.    Defendants failed to provide adequate training and instructions to surgeons, including Plaintiff's surgeon, which could have prevented failure of the Pinnacle Metal-on-Polyethylene device causing serious harm and suffering to patients, including Plaintiff.

107.    As a result of Defendants' conduct, Defendants are liable to Plaintiff in an amount to be determined by a jury at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment against the Defendants, individually and collectively, jointly and severally, as follows:

a.    For an award of compensatory damages in excess of Seventy-Five Thousand Dollars ($75,000.00);

b.    For an award of punitive or exemplary damages against Defendants;

c.    For reasonable attorney fees and costs;

d.    For pre-judgment interest; and

e.    For such further and other relief this Court deems just and equitable.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable with the maximum number of jurors permitted by law.

Respectfully submitted this _____25th_____ day of October, 2019.

21

/s/ David J. Hodge
David J. Hodge
AL Bar No. ASB-4617-I71H
MORRIS, KING & HODGE, PC
200 Pratt Avenue, NE
Huntsville, Alabama 35801
Tel: (256) 534-0588
Fax: (256) 533-4534
Email: dhodge@mkhlawyers.com
*Attorney for Plaintiff*

22